UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 11-30187 |
| THE DOMINION CLUB, L.C. | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DEBTOR'S MOTION FOR ENTRY OF ORDER
AUTHORIZING THE DEBTOR TO (A) OBTAIN
POST-PETITION FINANCING AND (B) ASSUME UNEXPIRED LEASE**

The above captioned debtor and debtor in possession (the "**Debtor**") hereby files this

Motion (the "**Motion**"), pursuant to sections 105(a), 361, 362, 363, 364, and 365 of title 11 of

the United States Code (the "**Bankruptcy Code**"), for entry of an order authorizing the Debtor to

enter into certain financing arrangements (the "**DIP Financing**") with Loch Levan Land Limited

Partnership ("**Lender**"). In support of this Motion, the Debtor respectfully states as follows:

**JURISDICTION**

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157

and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this

Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105(a), 361,

362, 363, 364, 365 and 507 of the Bankruptcy Code.

Bruce H. Matson (Virginia Bar No. 22874)
Vernon E. Inge, Jr. (Virginia Bar No. 32699)
Christian K. Vogel (Virginia Bar No. 75537)
LeClairRyan, A Professional Corporation
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 783-2003

*Proposed Counsel for Debtor and Debtor in Possession*

## BACKGROUND

3.　　On January 11, 2011 (the "**Petition Date**"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

4.　　The factual background relating to the Debtor, including its current and historical business operations and the events precipitating its chapter 11 filings, is set forth in detail in the *Declaration of James A. Crowder, Manager of The Dominion Club, L.C. in Support of Chapter 11 Petition and First Day Motions* (the "**Crowder Declaration**") incorporated herein by reference.[1]

5.　　The Debtor has continued in possession of its property and has continued to operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.　　No request has been made for the appointment of a trustee or an examiner in this case, and no official committee has yet been appointed by the Office of the United States Trustee.

7.　　The DIP Financing consists of senior secured, super-priority revolving credit financing of $1,500,000.00. The DIP Financing is governed by the Post-Petition Loan Agreement dated January 11, 2011, between the Debtor and Lender (the "**DIP Financing Agreement**").　A true and accurate copy of the DIP Financing Agreement is attached hereto as Exhibit A.

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Crowder Declaration.

8.     As detailed in the Crowder Declaration, the Debtor is an affiliated entity of the Lender.

## RELIEF REQUESTED

9.     By this Motion, the Debtor seeks entry of an interim and final order authorizing and/or approving:

a.     The Debtor to obtain post-petition financing consisting of a senior revolving credit facility of up to $1,500,000.00 from the Lender for use in accordance with the budget attached hereto as <u>Exhibit A</u> to the DIP Financing Agreement (the "**<u>Budget</u>**") pursuant to sections 364(c), (d) and (e) of the Bankruptcy Code;

b.     Subject to the Carve-Out (as defined in the DIP Financing Agreement), the grant of a superpriority claim status to the claims of Lender pursuant to Bankruptcy Code section 364(c)(1);

c.     As security for the repayment of the borrowings and all other obligations arising under the DIP Financing, the Debtor's grant to Lender of a first priority security interest in and liens upon all of the property and assets of the Debtor (the "**<u>Collateral</u>**"), subject to the Carve-Out, including avoidance actions, and pursuant to Bankruptcy Code sections 364(c)(2), (c)(3) and (d);

d.     The modification of the automatic stay to the extent set forth in the DIP Financing Agreement pursuant to Bankruptcy Code section 362;

e.     A waiver of the right, pursuant to section 506(c) of the Bankruptcy Code, to charge expenses of administration of the Debtor's bankruptcy case against the Lender's Collateral (as defined in the DIP Financing Agreement).

f.    Releases of the Lender and other certain entities as identified in Section 2.9 of the DIP Financing Agreement; and

g.    Assumption of that certain lease dated August 1, 1992, as renewed and amended, between The Dominion Club, L.C. as lessee and Loch Levan Land Limited Partnership as Leasor (the "**Lease**").

h.    The Debtor and its banking institution to honor pre-petition checks to the Virginia Department of Alcoholic Beverage Control, Associated Distributors, National Distributing, and Loveland Distributing.

## **BASIS FOR RELIEF**

10.    To continue paying its employees, maintain business operations, preserve assets, and preserve the Debtor as an on-going concern during this bankruptcy proceeding, the Debtor must have immediate access to continued and additional financing in the form of the DIP Financing.  The Debtor has concluded that such financing will enable it to retain employees and continue operations at the level expected by club members.   Moreover, access to the DIP Financing is necessary to avoid immediate and irreparable harm to the Debtor.

11.    The relevant terms of the DIP Financing are as follows:[2]

| | |
|---|---|
| Borrower | The Dominion Club, L.C. |
| DIP Lender | Loch Levan Land Limited Partnership |
| Commitment | A senior revolving credit financing of $1,500,000.00 |
| Borrowing Availability | Advances to the Debtor from time to time |

---

[2] This summary refers to the provisions and the defined terms contained in the DIP Financing Agreement. The DIP Financing Agreement shall control in the event of any inconsistencies between the provisions of this Motion and the DIP Financing Agreement.

4

provided that the aggregate amount of such Advances outstanding as of any date of determination does not exceed the Commitment.

| | |
|---|---|
| Use of Loan Proceeds | The proceeds will be used (a) to pay fees and expenses incurred in connection with the Debtor's bankruptcy case, including the Carve-Out; (b) to fund the continued operation of the Debtor; (c) for other general corporate purposes; and (d) for such other payments permitted to be made by Lender and, if required, approved by the Bankruptcy Court. |
| Term | The DIP Financing Agreement shall be effective as of the entry of an order by the Bankruptcy Court approving the DIP Financing Agreement and shall continue in full force and effect until such time as the financing has been paid in accordance with the DIP Financing Agreement. |
| Priority and Liens | Lender shall have a first-priority security interest and lien on the Collateral as defined in the DIP Financing Agreement pursuant to sections 364(c)(2) and 364(d) of the Bankruptcy Code and the DIP Financing Agreement. All Obligations shall constitute administrative expenses of the Debtor in the Bankruptcy Court, with priority under section 364(c)(1) of the Bankruptcy Code over any and all other administrative expenses of the kind under any provision of the Bankruptcy Code, but subject to the Carve-Out. |
| Fees and Expenses | The Debtor shall pay Lender all fees, costs and expenses specified in the DIP Financing Agreement as they are due and payable. |
| Interest Rate | 3 Month LIBOR plus 200 basis points |
| Events of Default | The DIP Financing Agreement contains |

usual and customary events of default for facilities of this type, including, but not limited to, the following events of default:

(a) The Debtor's failure to make any payment when due under the DIP Financing Agreement;

(b) The Debtor's failure to comply with or to perform any other term, obligation, covenant or condition contained in the DIP Financing Agreement;

(c) Either (i) the appointment of a trustee or an examiner having expanded powers to operate all or any part of the Debtor's business, (ii) the conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, or (iii) the dismissal of the Bankruptcy Case;

(d) The entry of any order which provides relief from the automatic stay otherwise imposed pursuant to section 362 of the Bankruptcy Code that permits any creditor to realize upon, or to exercise any right or remedy with respect to, the Collateral; and

(e) The Debtor's failure to comply with or to perform any term, obligation, covenant or condition contained in the Lease.

12.     The Debtor is unable to obtain unsecured and/or other secured financing similar to the DIP Financing.  Additionally, the Debtor's cash flow and capital structure render futile any effort to obtain unsecured and/or other secured financing similar to the DIP Financing with Lender.

## AUTHORITY FOR THE REQUESTED RELIEF

13.     If a debtor is unable to obtain unsecured credit allowable as an administrative expense under Bankruptcy Code section 503(b)(1), then the Court, after notice and a hearing, may authorize the debtor to obtain credit or incur debt (a) with priority over any or all administrative expenses of the kind specified in Bankruptcy Code section 503(b) or 507(b); or (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien. See 11 U.S.C. § 364(c).

14.     Furthermore, if a debtor is unable to obtain credit under the provisions of Bankruptcy Code section 364(c), the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly called a "priming lien." 11 U.S.C. § 364(d).

15.     Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain post-petition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).

16.     Bankruptcy Rule 4001(d) provides in relevant part that (i) a motion for approval to modify or terminate the automatic stay shall be served on any official creditors' committee, on the creditors included on the list filed under Bankruptcy Rule 1007(d), and on such other entities

as the court may direct, and (ii) objections may be filed within fourteen (14) days of the mailing of the notice of the motion and the time for filing objections thereto. See Fed. R. Bankr. P. 4001(d).

**A.      The DIP Financing Agreement Should Be Approved.**

17.      The Debtor negotiated the DIP Financing Agreement with Lender in good faith, and pursuant to the Debtor's sound business judgment. Provided that this judgment does not run afoul of the provisions of and policies underlying the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its business judgment. See, e.g., Bray v. Shenandoah Fed. Say. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) (approving debtor in possession financing necessary to sustain seasonal business); see also, In re Ames Department Stores, 115 B.R. 34, 40 (Banks. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest").

18.      The financing under the DIP Financing Agreement provides significant liquidity to the Debtor and thus will enable the Debtor, *inter alia:* (a) to minimize disruption to the Debtor's businesses and on-going operations; (b) enhance the value of the Debtor's estate for the benefit of all the Debtor's creditors; (c) avoid immediate and irreparable harm to the Debtor, its creditors, employees, and assets; and (d) permit the Debtor to continue to pursue the restructuring process.

19.      Such financing is the sole means of sustaining the Debtor's ongoing operations, thus preserving and enhancing the Debtor's going concern value. Without the financing

provided by the DIP Financing, the Debtor will not be able to meet its operating expenses (including payroll), will suffer irreparable harm, and its entire reorganization efforts will be severely jeopardized.

20.     The terms and conditions of the DIP Financing Agreement are fair and reasonable and were negotiated by the parties in good faith. Accordingly, Lender should be accorded the benefits of Bankruptcy Code section 364(e) in respect of the DIP Financing Agreement.

21.     Based upon the foregoing, the Debtor respectfully requests that the Court approve the DIP Financing Agreement in accordance with the terms set forth in the Interim and Final Orders and the DIP Financing Agreement.

**B.      Modification of the Automatic Stay Is Appropriate**

22.     Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition. The proposed Interim and Final Orders contemplate a modification of the automatic stay (to the extent applicable), to the extent necessary to: (a) entitle Lender to exercise its rights and remedies in accordance with the DIP Financing Agreement; and (ii) permit the Debtor to incur all liabilities and obligations under the DIP Financing.

23.     Stay modification provisions of this kind are ordinary and standard features of post-petition, debtor in possession financing facilities and, in the Debtor's business judgment, are reasonable under the present circumstances. Accordingly, the Debtor respectfully requests that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim and Final Orders and the DIP Financing Agreement.

**C.      Interim and Final Approval of the DIP Financing Agreement Should be Granted.**

24.      As set forth above, Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit under Bankruptcy Code section 364, may not be commenced earlier than fourteen (14) days after the service of such motion.

25.      Bankruptcy Rule 4001(c) further provides that the court may authorize the obtaining of credit pending a final hearing to the extent necessary to avoid immediate and irreparable harm to the estate.  As identified in the 13-week Budget attached to the DIP Financing Agreement as Exhibit A, failure to approve the DIP Financing Agreement on an interim basis will cause immediate and irreparable harm to the estate as it is estimated that the Debtor will need $68,219.00 in financing to continue operations in the first two weeks of the Bankruptcy Case.

26.      The Debtor requests that the Court authorize the Debtor from and after the entry of an interim order to assume the Lease and obtain credit under the terms contained in the DIP Financing Agreement on an interim basis and schedule and conduct a final hearing on the Motion on January 25, 2011, which is fourteen (14) days after the service of this Motion.

27.      Accordingly, based upon the foregoing, the Debtor respectfully requests that the Court grant interim and final approval of the DIP Financing Agreement in accordance with the terms set forth in the Interim and Final Orders and the DIP Financing Agreement.

**D.      Waiver of the Fourteen-Day Stay Provided by Bankruptcy Rule 6004 is Appropriate.**

28.      Bankruptcy Rule 6004(h) provides: "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  The Debtor requests that the Court waive this

fourteen-day stay. For the reasons discussed above, initial funding of amounts under the DIP Financing is critical to the continuing operations of the Debtor.

29.     Notice of this Motion will be given to: (i) the Office of the United States Trustee; (ii) counsel for Lender; (iii) the Debtor's forty-eight (48) largest unsecured creditors; and (v) any party that has filed a request for notice with the Court. The Debtor submits that, under the circumstances, no other or further notice of the Motion is required.

**E.     Assumption of the Lease should be Approved.**

30.     Section 365(a) of the Bankruptcy Code provides that a debtor-in-possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtors."  11 U.S.C. § 365(a).  Courts have uniformly deferred to the business judgment of debtors to determine whether the assumption of an unexpired lease is appropriate under § 365(a) of the Bankruptcy Code.  See NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984); Lubrizol Enterpr., Inc. v. Richmond Metal Finishers (In re Richmond Metal Finishers, Inc.), 756 F.2d 1043, 1046-47 (4th Cir. 1985); In re Minges, 602 F.2d 38, 42 (2d Cir. 1979); In re Frank G. Lawson, 146 B.R. 663, 664-65 (Bankr. E.D. Va. 1992).  To the extent that sound business reasons justify the assumption of a particular unexpired lease, assumption should be approved.

31.     Assumption of the Lease, as provided for in the DIP Financing Agreement, is supported by the Debtors' sound business judgment and is in the best interests of the Debtors' estate and its creditors as continuance of the Debtor's business is not feasible without the use of the leased property.  Assumption of the Lease is required at this point in the case because the DIP Financing will not be available without the assumption of the Lease.  When considered in light of the fact that the Debtor will be unable to secure necessary DIP Financing otherwise,

assumption of the lease at this point in the case is supported by sound business reasons and should be approved by the Court.

## NO PRIOR REQUEST

32.     No previous motion for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the form attached hereto, approving the relief set forth above and granting such other and further relief as the Court deems appropriate.

THE DOMINION CLUB, L.C.


/s/ Christian K. Vogel
Counsel

Bruce H. Matson (Virginia Bar No. 22874)
Vernon E. Inge, Jr. (Virginia Bar No. 32699)
Christian K. Vogel (Virginia Bar No. 75537)
LeClairRyan, A Professional Corporation
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 783-2003

*Proposed Counsel for Debtor and Debtor in Possession*

## **EXHIBIT A**

POST-PETITION LOAN AND SECURITY AGREEMENT

BETWEEN

LOCH LEVAN LAND LIMITED PARTNERSHIP,
as Lender

AND

THE DOMINION CLUB, L.C.,
as Debtor

JANUARY 11, 2011

ARTICLE I General Definitions...................................................................................1
    Section 1.1 Definitions.....................................................................................1
ARTICLE II Credit Facilities ....................................................................................7
    Section 2.1 Commitment To Provide Loans....................................................7
    Section 2.2 Method of Borrowing...................................................................7
    Section 2.3 Interest Rate and Interest Payments............................................7
    Section 2.4 Computation of Interest...............................................................7
    Section 2.5 Extension of Credit Period...........................................................7
    Section 2.6 Statements of Account..................................................................8
    Section 2.7 Maturity; Payments......................................................................8
    Section 2.8 Super Priority Nature of Obligations and Liens ..........................8
    Section 2.9 Releases.......................................................................................8
    Section 2.10 Waiver of Priming Rights..........................................................8
    Section 2.11 Use of Proceeds.........................................................................9
    Section 2.12 Carve Out...................................................................................9
ARTICLE III Conditions to Loans ............................................................................9
    Section 3.1 Initial Loan..................................................................................9
    Section 3.2 All Loans...................................................................................10
ARTICLE IV Security Interests................................................................................11
    Section 4.1 Grant of Security Interests ........................................................11
    Section 4.2 Continuing Liability of the Debtor ...........................................12
    Section 4.3 Collections.................................................................................12
ARTICLE V Representations and Warranties ..........................................................13
    Section 5.1 Corporate Existence and Power................................................13
    Section 5.2 Corporate and Governmental Authorization; Contravention....13
    Section 5.3 Binding Effect............................................................................13
    Section 5.4 Ownership and Liens .................................................................14
    Section 5.5 Filings .......................................................................................14
ARTICLE VI Other Covenants ................................................................................14
    Section 6.1 Reporting Requirements ...........................................................14
    Section 6.2 Supplemental Budgets ..............................................................14
    Section 6.3 Conduct of Business and Maintenance of Existence .................15
    Section 6.4 Compliance with Laws. .............................................................15
    Section 6.5 Accounting; Inspection of Property, Books and Records..........15
    Section 6.7 Debt............................................................................................15
    Section 6.8 Restriction on Liens ..................................................................16
    Section 6.9 Notices ......................................................................................16
    Section 6.10 Consolidations, Mergers and Sale of Assets............................16
    Section 6.11 Capital Expenditures ...............................................................16
    Section 6.12 Transactions with Other Persons ............................................16
    Section 6.13 Independence of Covenants .....................................................16
ARTICLE VII Event of Default/Remedies................................................................17
    Section 7.1 Events of Default.......................................................................17
    Section 7.2 Termination of Commitment/Acceleration................................18
    Section 7.3 UCC Rights................................................................................19
    Section 7.4 Right of Set-Off .........................................................................19

Section 7.5 Payments on Collateral ..............................................................19
Section 7.6 Possession of Collateral ............................................................19
Section 7.7 Sale of Collateral........................................................................19
Section 7.8 Rights of Purchasers ..................................................................20
Section 7.9 Remedies Not Exclusive ............................................................20
Section 7.10 Power of Attorney......................................................................20
Section 7.11 Application of Proceeds ............................................................21
ARTICLE VIII Miscellaneous.................................................................................21
Section 8.1 Notices .......................................................................................21
Section 8.2 No Waivers .................................................................................22
Section 8.3 Expenses ....................................................................................23
Section 8.4 Amendments and Waivers ..........................................................23
Section 8.5 Successors and Assigns; Survival ..............................................23
Section 8.6 Virginia Law ...............................................................................23
Section 8.7 Counterparts; Effectiveness .......................................................23
Section 8.8 Waiver of Jury Trial; Submission to Jurisdiction .....................23
Section 8.9 Severability .................................................................................24
Section 8.10 Entire Agreement; Conflicts .....................................................24

# EXHIBITS

Exhibit A -    Initial Budget

Exhibit B -    Final Order

# POST-PETITION LOAN AND SECURITY AGREEMENT

This POST-PETITION LOAN AND SECURITY AGREEMENT (as amended, supplemented or modified from time to time, this "*Agreement*"), dated as of January 11, 2011, is between THE DOMINION CLUB, L.C., a Virginia limited liability company ("*Debtor*"), and LOCH LEVAN LAND LIMITED PARTNERSHIP, a Virginia limited partnership ("*Lender*").

## RECITALS

A.        The Debtor filed a voluntary petition under Chapter 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq.* (the "*Bankruptcy Code*") on January 11, 2011 (the "*Petition Date*") in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "*Bankruptcy Court*").

B.        In the exercise of its business judgment, the Debtor has identified a need for additional working capital after the Petition Date in order to conduct the Bankruptcy Case and fulfill its obligations under the Bankruptcy Code.

C.        The Debtor has been unable to locate another source of financing for its working capital needs despite its best and reasonable efforts.

D.        To address the Debtor's need for working capital after the Petition Date, the Lender has agreed to provide Loans (as defined below) to the Debtor on the terms and conditions of this Agreement (the "*DIP Facility*") which were negotiated in good faith.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the above premises and the mutual covenants and agreements contained herein, the Lender and the Debtor hereby agree as follows:

## ARTICLE I
## General Definitions

Section 1.1     Definitions.  The following terms, as used herein, have the following meanings:

"Account Debtor" means, with respect to any Receivable or General Intangible, any Person obligated to make payment thereunder, including without limitation any account debtor thereon.

"Accounts" means any "Account," as such term is defined in Section 9-102 of the UCC, now owned or hereafter acquired by the Debtor, and any right of the Debtor to payment for goods sold or leased or for services rendered that the Debtor may now have or hereafter acquire, whether or not such right has been earned by performance.

"Agreement" has the meaning ascribed to it in the preamble to this Agreement.

"Availability" means at any time, the amount by which the Commitment exceeds the outstanding balance of all Obligations.

"Bankruptcy Case" means the case commenced by the Debtor in the Bankruptcy Court under Chapter 11 of the Bankruptcy Code.

"Bankruptcy Code" has the meaning ascribed to it in the Recitals of this Agreement.

"Bankruptcy Court" has the meaning ascribed to it in the Recitals of this Agreement.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and Official Forms that govern procedure in cases under the Bankruptcy Code, as heretofore and hereafter amended.

"Biweekly Report" means a financial report created by the Debtor, substantially in the form of the Budget, reflecting the sources and uses of cash in each particular category identified in the Budget for a particular two week period covered by the Budget and that includes a column reflecting the amount of variance for each particular category of the Budget for the subject two week period.

"Budget" means the Initial Budget, as such budget may be amended, modified, replaced or supplemented from time to time by a Supplemental Budget.

"Budget Week" means each week that is the subject of the Budget.

"Business Day" means any day except a Saturday, Sunday or other day on which commercial banks in Richmond, Virginia are authorized by law to close.

"Carve-Out" means the carve-out of the Lender's Liens on the Collateral described in and governed by Section 2.12 of this Agreement.

"Carve-Out Account" means the account established by the Debtor for purposes of funding the Carve-Out as provided in Section 2.12 of this Agreement.

"Causes of Action" means any and all claims, causes of action, and rights to sue now owned or hereafter acquired by the Debtor, including without limitation all claims, causes of action and rights arising under state or federal law in connection with Chapter 5 of the Bankruptcy Code.

"Claim" has the meaning ascribed to that term in Bankruptcy Code § 101(5).

"Collateral" means all of the assets that are subject to the Liens granted in Section 4.1 of this Agreement.

"Commitment" means the commitment to make Loans up to an aggregate amount as set forth in Section 2.1 of this Agreement and as limited by the terms and conditions of this Agreement.

"Committee" means any official committee of unsecured creditors appointed by the United States Trustee in the Bankruptcy Case.

"Committee Expenses" means the expenses of the Committee, including fees and expenses of counsel and other professional advisors to the Committee whose employment has been approved by a final, non-appealable order entered by the Bankruptcy Court.

"Copyrights" means all right, title and interest the Debtor now owns or hereafter acquires in and to all statutory or common law copyrights, whether or not registered with the United States Copyright Office, and all registrations and recordings thereof and all applications in connection therewith, including without limitation all such registrations, recordings, and applications in the U.S. Copyright Office or in any similar office or agency of the United States, any State thereof or any other country or political subdivision thereof and all reissues, extensions, and renewals thereof.

"Credit Period" means the period from the Effective Date to the earlier of (i) one (1) year after the Petition Date, and (ii) the termination of the Commitment pursuant to Article VII of this Agreement, unless extended by the Lender in writing pursuant to Section 2.5 of this Agreement.

"Debt" means (i) indebtedness or liability for borrowed money; (ii) obligations evidenced by bonds, debentures, notes and other similar instruments; (iii) obligations for the deferred purchase price of property or services (including trade obligations); (iv) all guarantees, endorsements (other than collection or deposit in the ordinary course of business), and other contingent obligations to purchase, to provide funds for payment, to supply funds to invest in any person or entity, or otherwise to assure a creditor against loss; and (v) obligations secured by any Liens, whether or not the obligations have been assumed.

"Debtor" has the meaning ascribed to it in the preamble to this Agreement.

"Effective Date" means the date on which this Agreement becomes effective in accordance with Section 8.7 of this Agreement.

"Equipment" means all equipment now owned or hereafter acquired by the Debtor, including all items of machinery, equipment, computer hardware and related items, furnishings and fixtures of every kind, whether affixed to real property or not, as well as all automobiles, trucks and vehicles of every description, equipment, all additions to, substitutions for, replacements of or accessions to any of the foregoing, all attachments, components, parts (including spare parts) and accessories whether installed thereon or affixed thereto and all fuel for any thereof.

"Event of Default" has the meaning ascribed to that phrase in Section 7.1 of this Agreement.

"Final Order" means the order of the Bankruptcy Court entered in the Bankruptcy Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be substantially in the form annexed hereto as Exhibit B and shall otherwise be satisfactory in form and substance to Lender in its sole discretion, and from which no appeal or motion to reconsider, amend or vary has been filed, and such order is not in any respect subject to a stay pending appeal, together with all extensions, modifications, amendments or supplements thereto, in form and substance satisfactory to Lender in its sole discretion, which, among other matters but not by way of limitation, authorizes the Debtor to execute and perform under the terms of this Agreement to obtain credit, incur the Obligations, grant the Liens described under this Agreement, and assume the Lease, and authorizes the Debtor and its banking institution to honor pre-petition checks to the Virginia Department of Alcoholic Beverage Control, Associated Distributors, National Distributing, and Loveland Distributing.

"GAAP" means generally accepted accounting principles in the United States.

"General Intangibles" means all right, title and interest the Debtor now owns or hereafter acquires in or to all Causes of Action, contract rights, documents, books, ledgers, records, money and general intangibles now owned or hereafter acquired by the Debtor including, without limitation, all customer lists, permits, federal and state tax refunds, Patents, Copyrights, Trademarks, Licenses, other rights in intellectual property, and the balance of every deposit account now or hereafter existing of the Debtor with any bank, all monies of the Debtor and all rights to payment of money of the Debtor, and all books, ledgers and records and all computer programs, tapes, discs, punch cards, data processing software, transaction files, master files and related property and rights (including computer and peripheral equipment) necessary or helpful in enforcing, identifying or establishing any item of Collateral.

"Government" means any Federal, state or local government, authority, agency, court or other body, officer or entity, and any arbitrator with authority to bind a party at law.

"Initial Budget" means the initial 13-week budget of sources and uses of cash, substantially in the form annexed hereto as Exhibit A, which budget has been approved by the Lender in its reasonable discretion.

"Initial Loan" means the first Loan made to the Debtor hereunder at the commencement of the Credit Period.

"Interim Order" means the order of the Bankruptcy Court entered in the Bankruptcy Case after an interim hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be satisfactory in form and substance to Lender in its reasonable discretion, which, among other matters but not by way of limitation, authorizes the Debtor to execute and perform under the terms of this Agreement to obtain credit, incur the Obligations, grant the Liens described under this Agreement, and assume the Lease on an interim basis, and authorizes the Debtor and its banking institution to honor pre-petition checks to the Virginia Department of Alcoholic Beverage Control, Associated Distributors, National Distributing, and Loveland Distributing.

"Inventory" means all right, title and interest the Debtor now owns or hereafter acquires in or to inventory, including without limitation (i) all goods and other personal property held for resale by the Debtor, (ii) all inventory, wherever located, evidenced by negotiable and non-negotiable documents of title, warehouse receipts and bills of lading, (iii) all of the Debtor's rights in, to and under all purchase orders now owned or hereafter received or acquired by it for goods or services, and (iv) all rights of the Debtor as an unpaid seller, including rescission, replevin, reclamation and stopping in transit.

"Investment Property" has the meaning ascribed to it in the UCC.

"Lease" means that certain LEASE AGREEMENT dated August 1, 1992, as amended and renewed, between The Dominion Club, Inc., predecessor to The Dominion Club, LLC, and Loch Levan Land Limited Partnership, and any supplement, modification, renewal, and/or amendment related thereto.

"Lender" has the meaning ascribed to it in the preamble to this Agreement.

"LIBOR" means the 3 Month London Interbank Offered Rate, which referenced interest rate is published in the Wall Street Journal and will be set once a month on the first day of the month.

"License" means any license or other agreement granting a Person other than the Debtor the exclusive or non-exclusive right to use and/or license the use of any Patent, Copyright, Trademark or other intellectual property owned by the Debtor.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind with respect to such asset.

"Loan" means a loan made by the Lender to the Debtor pursuant to this Agreement, and "Loans" means all of such loans.

"Member Contract" means any and all contracts in whatever form between the Debtor and the members of The Dominion Club for membership in the club.

"Notice of Termination" has the meaning ascribed to it in Section 2.12 of this Agreement.

"Obligations" means all obligations or liabilities now or hereafter payable by the Debtor to the Lender pursuant to this Agreement, whether or not evidenced by notes or other instruments, and whether such indebtedness, obligations and liabilities are direct or indirect, fixed or contingent, liquidated or unliquidated, due or to become due, or secured or unsecured, including without limitation all obligations of the Debtor with respect to the Loans and all expenses described in Section 8.3 of this Agreement.

"Patents" means all right, title and interest the Debtor now owns or hereafter acquires in or to all letters patent and the inventions described therein, and all registrations and recordings thereof and all applications in connection therewith, including without limitation all such

recordings, registrations and applications in the U.S. Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, or any other country (or political subdivision thereof) and all reissues, extensions, and renewals thereof.

"Permitted Liens" means the Liens permitted by Section 6.8(i) or (ii) of this Agreement.

"Permitted Variance" means (i) expenses that do not exceed, on a cumulative basis, the amounts set forth in the Budget for the relevant thirteen week period by more than ten percent (10%) in the aggregate, and (ii) revenues that are not less, on a cumulative basis, than ten percent (10%) of the aggregate amount set forth in the Budget for the relevant thirteen week period.

"Person" means an individual, a corporation, a partnership, a limited liability company, an association, a trust or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"Petition Date" has the meaning ascribed it in the Recitals to this Agreement.

"Pre-Carve Out Notice Amount" has the meaning ascribed to it in Section 2.12 of this Agreement.

"Proceeds" means all proceeds, including (i) whatever is received upon any collection, exchange, sale or other disposition of any of the Collateral and any property into which any of the Collateral is converted, whether cash or non-cash, (ii) any and all payments or other property (in any form whatsoever) made or due and payable on account of any insurance, indemnity, warranty or guaranty payable to the Debtor with respect to any of the Collateral, (iii) any and all payments (in any form whatsoever) made or due and payable in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental body, authority, bureau or agency (or any person, corporation, agency, authority or other entity acting under color of any governmental authority), (iv) any claim of the Debtor against third parties for past, present or future infringement of any Patent or Copyright, for past, present or future infringement or dilution of any Trademark, or for injury to the goodwill associated with any Trademark, Patent or Copyright, or for the breach of any License, and (v) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"Professional Expenses" means the fees and expenses of counsel and other professional advisors to the Debtor whose employment has been approved by final, non-appealable orders entered by the Bankruptcy Court.

"Receivables" means all Accounts now or hereafter owing to the Debtor, and shall also mean all accounts, accounts receivable, contract rights, book debts, instruments and chattel paper, notes, drafts, acceptances, payments under leases of equipment or sale of Inventory and other forms of obligations now or hereafter received by or belonging or owing to the Debtor for goods sold or leased and/or services rendered by them, and all of the Debtor's rights in, to and under all purchase orders, instruments, and other documents now or hereafter received by them evidencing obligations for and representing payment for goods sold or leased and/or services

rendered, and all monies due or to become due to the Debtor under all contracts for the sale or lease of goods and/or the performance of services by the Debtor, now in existence or hereafter arising (including without limitation the right to receive the Proceeds of said purchase orders and contracts), together with all Inventory returned by or reclaimed from customers wherever such Inventory is located, and all guaranties, securities and liens held for the payment of any such account, account receivable, contract right, document, instrument or chattel paper.

"Supplemental Budget" means an updated, supplemental or replacement 13-week budget of sources and uses of cash delivered in accordance with Section 6.2 of this Agreement, or otherwise, that has been approved by the Lender in its reasonable discretion.

"Tax" means any fee (including license, filing and registration fee), tax (including any income, gross receipts, franchise, sales, use or real, personal, tangible or intangible property tax), interest equalization or stamp tax, assessment, levy, impost, duty, charge or withholding of any kind or nature whatsoever, imposed or assessed by any Government, together with any penalty, fine or interest thereon.

"Trademarks" means all right, title and interest the Debtor now owns or hereafter acquires in or to all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos, other source of business identifiers, print and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof and all applications in connection therewith, including without limitation all such registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or political subdivision thereof and all reissues, extensions, and renewals thereof.

"UCC" means at any time the Uniform Commercial Code as the same may from time to time be in effect in the Commonwealth of Virginia, provided that, if, by reason of mandatory provisions of law, the validity or perfection of any security interest granted herein is governed by the Uniform Commercial Code as in effect in a jurisdiction other than Virginia then, as to the validity or perfection of such security interest, "UCC" shall mean the Uniform Commercial Code in effect in such other jurisdiction.

## ARTICLE II
## Credit Facilities

Section 2.1    Commitment To Provide Loans.  The Lender agrees, on the terms and conditions set forth in this Agreement, including without limitation the provisions of Article III, to make Loans to the Debtor from time to time during the Credit Period in an aggregate principal amount not to exceed $1,500,000.00.  The Debtor agrees to repay all of the Obligations owed to the Lender under the terms of this Section 2.1 and this Agreement.  Subject to the terms and conditions of this Agreement, the Debtor may borrow under this paragraph, repay and re-borrow, provided that at no time shall the total aggregate Obligations of the Debtor to the Lender exceed

the Commitment and provided that the Debtor is otherwise in compliance with all other terms of this Agreement.

Section 2.2    Method of Borrowing.  The Debtor shall request Loans by submitting a written request to the Lender by no later than 11:00 a.m. prevailing Eastern Time on the last Business Day of any Budget Week specifying the principal amount of the Loan requested for the next succeeding Budget Week.  The Lender shall honor each Loan request by making, on the second Business Day of the Budget Week to which such request relates, a wire transfer to the Debtor's operating account in the amount of the Loan requested, provided that (i) honoring the request would not cause the aggregate amount of outstanding Loans to exceed the Commitment; (ii) an Event of Default has not occurred and is continuing and has not been cured; and (iii) the Debtor is otherwise in compliance will all other terms of this Agreement.  If these conditions are not all satisfied, the Lender will have no obligation to honor the request or any further request until the unsatisfied conditions are resolved, and the Lender will not be held liable for any damages resulting from its refusal to honor a request.  Each request for a Loan shall constitute a representation by the Debtor that each of the representations and warranties in Article V of this Agreement is true and complete in all material respects as of the date of such request.

Section 2.3    Interest Rate and Interest Payments.  As provided further below, interest shall accrue on the average daily outstanding balance of the Loans at the rate of the LIBOR set monthly on the first day of the month plus 200 basis points.  Interest shall be paid by the Debtor monthly in arrears on the first Business Day of each month and may, in Lender's discretion, be paid by the Lender by making a Loan to the Debtor in the amount of such interest.  The final payment of all accrued and unpaid interest shall be due and payable on the date that the outstanding principal amount of the Loans is paid or becomes due and payable in full.  In the event of an Event of Default, the Loans shall thereafter bear interest on the outstanding principal balance thereof at a rate per annum equal to the sum of the non-default interest rate plus 2% per annum from the date of the Event of Default until the Loans are paid in full.

Section 2.4    Computation of Interest.  Interest hereunder shall be computed on the basis of a year of 360 days and paid for the actual number of days elapsed (including the first day but excluding the last day).

Section 2.5    Extension of Credit Period.  The Credit Period shall expire automatically unless the Debtor makes a written request to the Lender not later than five (5) Business Days prior to expiration of the Credit Period requesting an extension of the Credit Period and such request is approved in writing by the Lender prior to expiration of the Credit Period.  The right of the Lender not to extend the Credit Period shall be unconditional and within its sole discretion, notwithstanding that no Event of Default exists under this Agreement and regardless of the adequacy of the Collateral or the Debtor's performance of its obligations hereunder or any other condition.

Section 2.6    Statements of Account.  The obligation of the Debtor to the Lender to repay the Loans or any of the other Obligations under this Agreement will not be evidenced by a grid or other promissory note.  The outstanding balance of all such Obligations shall be recorded on the

books and records of the Lender. The Lender shall provide the Debtor monthly with a written statement of account and such statement shall be deemed binding on the Debtor unless the Debtor notices the Lender in writing of its objection to such statement within ten (10) Business Days after the date of such statement. Any such notice shall be deemed an objection only to those items specifically objected to therein.

Section 2.7    Maturity; Payments.  The Loans shall mature, and the principal amount of all outstanding Loans, together with all accrued and unpaid interest thereon and all other Obligations that may be due to the Lender under this Agreement, shall be immediately due and payable by the Debtor to the Lender upon the expiration of the Credit Period, as it may have been extended by the Lender pursuant to Section 2.5 of this Agreement, without further application or notice to or order of, or hearing before, the Bankruptcy Court. All payments by the Debtor shall be made to the Lender in lawful money of the United States of America and in immediately available funds. Whenever any payment to be made hereunder shall be due on a day that is not a Business Day, such payment shall be made on the first Business Day thereafter, and such extension of time shall in such case be included in the computation of interest hereunder.

Section 2.8    Super Priority Nature of Obligations and Liens.  All Obligations shall constitute super priority administrative expense claims under Section 364(c) of the Bankruptcy Code, and such administrative claims shall have priority over any and all administrative expenses of the type specified in Bankruptcy Code §§ 503(b) and 507(b), and shall at all times be senior to the rights of the Debtor, the Debtor's estate and any successor trustee or estate representative in the Debtor's Bankruptcy Case or any subsequent proceeding or case under the Bankruptcy Code, but subject in all cases to the Carve-Out. All Obligations shall constitute under Section 364(c) of the Bankruptcy Code first priority, senior secured liens on all property of the Debtor's estate.

Section 2.9    Releases.  The Debtor hereby acknowledges that the Debtor has no defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature that can be asserted to reduce or eliminate all or any part of the Debtor's liability to repay the Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from the Lender whether related to this Agreement, the Lease, or otherwise. The Debtor also releases the Lender and any affiliate(s) of the Lender from any and all claims that may belong to the Debtor and that arose prior to the Petition Date whether related to the Lease or otherwise. Finally, the Debtor waives any right, pursuant to Section 506(c) of the Bankruptcy Code, to charge expenses of administration of the Debtor's Bankruptcy Case against the Lender's Collateral.

Section 2.10   Waiver of Priming Rights.  Upon the Effective Date, and on behalf of itself and its estate, and for so long as any Obligations shall be outstanding, the Debtor hereby irrevocably waives any right (i) to grant or impose, or request that the Bankruptcy Court grant or impose under Section 364 of the Bankruptcy Code or otherwise, Liens on or security interests in any Collateral that are *pari passu* with, equal to or superior to the Liens and security interests held by the Lender; (ii) to grant or impose, or request that the Bankruptcy Code impose under Section 364 of the Bankruptcy Code or otherwise, claims or expenses against the Debtor that are *pari*

9

*passu* with, equal to or superior to the Obligations; and (iii) to use, or to request that the Bankruptcy Court authorize the use, of proceeds of Collateral or proceeds of Loans except for such uses expressly provided for in this Agreement.

Section 2.11    Use of Proceeds.  The proceeds of the Loans shall be used only (i) first to repay all outstanding Obligations to the Lender hereunder then due; and (ii) thereafter (a) to pay the costs of the Debtor's operations not otherwise funded by the use of cash receipts in accordance with the Budget, and (b) to pay bankruptcy-related and other professional fees and expenses incurred by the Debtor in accordance with the Budget.

Section 2.12    Carve Out. The Lender's Liens on the Collateral and claims, including any superpriority administrative expense claims as specified in Section 2.8, are subject to a carve out (the "*Carve Out*") in an amount not to exceed (A) all accrued but unpaid Professional Expenses and Committee Expenses (whether then or subsequently allowed) provided in the Budget and incurred by the Debtor or Committee plus fees incurred pursuant to 28 U.S.C. § 1930 and fees payable to the clerk of the Court prior to the date of delivery by the Lender to the Debtor and its counsel of record of a notice of termination of funding (a "*Notice of Termination*") pursuant to Section 7.2 (the "*Pre-Carve Out Notice Amount*"), provided that, such Pre-Carve Out Notice Amount shall not exceed the amounts set forth in the Budget for such items through the date of such notice, plus (B) $50,000 for the payment of Professional Expenses, fees incurred pursuant to 28 U.S.C. § 1930, and fees payable to the clerk of the Court arising after delivery of the Notice of Termination, plus (C) the difference between the total Committee Expenses incurred as of the delivery of the Notice of Termination and $50,000 for the payment of Committee Expenses.


### ARTICLE III
### Conditions to Loans

As a condition precedent to any obligation of the Lender to fund the Loans or to otherwise extend credit to the Debtor, the following conditions must have been satisfied.  All documents and opinions referred to in this Article shall be in form and substance satisfactory to the Lender and its counsel in their sole discretion.

Section 3.1    Initial Loan.  In the case of the Initial Loan:

(i)    all legal matters incident to this Agreement and the transactions contemplated hereby and thereby shall be reasonably satisfactory to the Lender and legal counsel for the Lender;

(ii)    the receipt and approval by the Lender of the Initial Budget in its reasonable discretion;

(iii)    the Bankruptcy Court shall have entered the Interim Order;

10

(iv)    receipt by the Lender of all documents it may reasonably request relating to the existence of the Debtor and its corporate authority to execute, deliver and perform this Agreement, and such other documents and any other matters relevant hereto or thereto, all in form and substance satisfactory to the Lender in its sole discretion.

Section 3.2    All Loans.  In the case of each Loan:

(i)  all conditions in Section 3.1 have been satisfied;

(i)  the Bankruptcy Court shall have entered the Final Order that is not the subject of an appeal or motion to reconsider, amend or vary, or the subject of a similar proceeding, and is not in any respect stayed;

(ii)  receipt by the Lender of any loan request required by Section 2.2 of this Agreement and all such other documents the Lender requires in connection with its commitment to make Loans;

(iii)  receipt by the Lender in form acceptable to the Lender of all financial reporting and other documentation contemplated by this Agreement, including without limitation, the documentation contemplated by Section 6.1 of this Agreement;

(iv)  the Budget in effect as of the date of the loan request, and approved by the Lender, contains a budget of sources and uses of cash for at least five (5) weeks following the date of the loan request;

(v)  upon notice to the Lender, written or otherwise, of the commencement of, or intent to commence, an action by any party against any interest of the Lender or any of its affiliates concerning or in any way related to the Debtor, and within five (5) days following written notice by the Lender to the Debtor, the Debtor shall have obtained from the Bankruptcy Court entry of either (a) a temporary restraining order, (b) a preliminary injunction or (c) a final order, in form and substance acceptable to the Lender in its sole discretion, and such order shall not have been stayed and otherwise shall continue to be in effect and valid enjoining claims related to the Debtor against the Lender or affiliates, as the case may be; provided, however, that the entry of any such order shall be a condition precedent in respect of each Loan from and after the date of the Lender's notice to the Debtor pursuant to this paragraph;

(vi)  no Event of Default has occurred and is continuing or would result from making such Loan; and

(vii)  the representations and warranties of the Debtor contained in this Agreement shall be true and complete in all material respects as of the date of such Loan.

## ARTICLE IV
## Security Interests

Section 4.1    Grant of Security Interests.   To secure the due and punctual payment of all Obligations, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now existing or hereafter arising or due or to become due, in accordance with the terms thereof and to secure the due and punctual performance of all of the Obligations of the Debtor contained in this Agreement, and in order to induce the Lender to enter into this Agreement and make the Loans, the Debtor hereby grants to the Lender, subject in all cases only to the Carve-Out, a first priority senior security interest in and lien upon, all of the Debtor's right, title and interest in all present and after-acquired property of the Debtor of any nature whatsoever (both real and personal), including, without limitation, to and under the following assets, whether now existing or hereafter acquired:

(i)  all Receivables;

(ii)  all General Intangibles;

(iii)  all Investment Property;

(iv)  all Inventory;

(v)  all Equipment;

(vi)  to the extent not included in the foregoing, all real property, real property leaseholds, fixtures, contracts, chattel paper, and machinery;

(vii)  to the extent not included in the foregoing, all Member Contracts;

(viii)  to the extent not included in the foregoing, all other personal property, whether tangible or intangible and wherever located, including, but not limited to, the balance of every deposit account now or hereafter existing of the Debtor with any bank and all monies of the Debtor and all rights to payment of money of the Debtor;

(ix)  to the extent not included in the foregoing, all books, ledgers and records and all computer programs, tapes, disks, punch cards, data processing software, transaction files, master files and related property and rights (including computer and peripheral equipment) necessary or helpful in enforcing, identifying or establishing any item of Collateral;

(x)  to the extent not included in the foregoing, all proceeds and other amounts received in respect of the Causes of Action including, without limitation, all claims, causes of action and rights arising under state or federal law in connection with Chapter 5 of the Bankruptcy Code; and

(xi) to the extent not otherwise included, all cash and noncash Proceeds and products of any or all of the foregoing, whether existing on the date hereof or arising hereafter.

As for the method of perfecting the Lender's security interests and Liens in the Collateral, such perfection will be governed by and granted in the Final Order and will become effective immediately upon entry of the Final Order without any further action or notice required on the part of the Debtor or the Lender to achieve the perfection. The entry of the Final Order will be deemed to be proper and complete perfection of the Lender's security interests and Liens in the Collateral granted herein and no further order or action or notice will be necessary or required. The entry of the Final Order will also be deemed to be sufficient notice to all interested parties of the perfection of the Lender's security interests and Liens in the Collateral, which will not be subject to any challenge from the Debtor or any other interested party.

Section 4.2    Continuing Liability of the Debtor.    Anything herein to the contrary notwithstanding, the Debtor shall remain liable to observe and perform all of the terms and conditions to be observed and performed by it under any contract, agreement, warranty or other obligation with respect to the Collateral, and shall do nothing to impair the security interests herein granted. The Lender shall not have any obligation or liability under any such contract, agreement, warranty or obligation by reason of or arising out of this Agreement or the receipt by the Lender of any payment relating to any Collateral, nor shall the Lender be required to perform or fulfill any of the obligations of the Debtor with respect to the Collateral or to make any inquiry as to the nature or sufficiency of any payment received by the Lender or the sufficiency of the performance of any party's obligations with respect to any Collateral. Furthermore, the Lender shall not be required to file any claim or demand to collect any amount due or to enforce the performance of any party's obligations with respect to, the Collateral.

Section 4.3    Collections. Subject to the Carve-Out:

(i) All Proceeds and any other collections received by the Debtor shall be promptly deposited in the Debtor's operating accounts and until so deposited shall be held in trust for and as the Lender's property and shall not be commingled with any funds of the Debtor not constituting Proceeds of Collateral. However, the Lender may upon an Event of Default notify Account Debtors obligated to make payments under any or all Receivables or General Intangibles that the Lender has a security interest in such Collateral and that payments shall be made directly to the Lender. Upon the request of the Lender at any time, the Debtor shall so notify such Account Debtors. The Debtor shall use all reasonable efforts to cause each Account Debtor to comply with the foregoing instruction. In furtherance of the foregoing, the Debtor authorizes the Lender (i) to ask for, demand, collect, receive and give acquittances and receipts for any and all amounts due and to become due under any Collateral, in the name of the Debtor or its own name or otherwise, (ii) to take possession of, endorse and collect any checks, drafts, notes acceptances or other instruments for the payment of monies due under any Collateral and (iii) to file any claim or take any other action in any court of law or equity or otherwise that it may deem appropriate for the purpose of collecting any amounts due

under any Collateral. The Lender agrees to maintain a record of the sources of any receipts with respect to its efforts to realize against the Collateral.

(ii) As to any amount payable under or in connection with any of the Collateral that shall be or shall become evidenced by any promissory note or other instrument, the Debtor shall pledge immediately and deliver such note or other instrument to the Lender as part of the Collateral, duly endorsed in a manner satisfactory to the Lender.

(iii) The Debtor shall not, without the Lender's prior written consent, (i) grant any extension of the time of payment of any Receivable, (ii) compromise or settle any Receivable or Cause of Action, (iii) release, wholly or partly, any person liable for the payment of any Receivable, or (iv) allow any credit or discount whatsoever with respect to any Receivable other than trade discounts granted in the normal course of business consistent with past practices and other reasonable discounts or compromises necessary in the reasonable judgment of the Debtor to enhance the collectability of any Receivable.

## ARTICLE V
## Representations and Warranties

The Debtor represents and warrants that:

Section 5.1    Corporate Existence and Power.   The Debtor is a Virginia limited liability company, duly formed, validly existing, and in good standing under applicable law and has all corporate powers and all authorizations, consents, approvals and governmental licenses required to carry on the business of the Debtor as now conducted.

Section 5.2    Corporate and Governmental Authorization; Contravention.   The execution, delivery and performance by the Debtor of this Agreement and any other documents to which the Debtor and the Lender are parties, including but not limited to the creation of the security interests and Liens provided for herein, (i) are within the Debtor's corporate power, (ii) have been duly authorized by all necessary corporate action, and (iii) other than the entry of the Final Order, require no action by or with respect to, or filing with, any Government (except with respect to the filing and/or recording of financing statements or other instruments, but only if necessary and are not otherwise governed by the Final Order) and do not contravene, or constitute (with or without the giving of notice or lapse of time or both) a default under, any provision of applicable law or of the articles of incorporation or by-laws of the Debtor or of any agreement, judgment, injunction, order, decree or other instrument binding upon or affecting the Debtor or result in the creation or imposition of any Lien on any of its assets except as granted herein.

Section 5.3    Binding Effect.   This Agreement constitutes a valid and binding agreement of the Debtor, and the obligations hereunder are enforceable against the Debtor, in accordance with its terms, except as rights of acceleration and the availability of equitable remedies may be limited by the Bankruptcy Code or equitable principles of general applicability.

Section 5.4    Ownership and Liens.  The Debtor is the sole owner of and has good and marketable title to all of its properties and assets, and no such properties or assets are subject to any Liens, whether statutory or otherwise, except as provided herein.

Section 5.5    Filings.  All actions by or with respect to, and all filings with, any Government required in connection with the execution, delivery and performance of this Agreement and any other documents to which the Debtor and the Lender are parties, or necessary for the validity or enforceability thereof or for the protection or perfection of the rights and interests of the Lender thereunder, will, prior to the date of delivery thereof, have been duly taken or made, as the case may be, and will at all times thereafter remain in full force and effect.

## ARTICLE VI
## Other Covenants

The Debtor agrees that so long as the Lender is committed to make Loans hereunder or any amount payable hereunder or under any other document to which the Debtor and the Lender are parties remains unpaid:

Section 6.1    Reporting Requirements.  The Debtor shall deliver or cause to be delivered to the Lender:

(i) the Biweekly Report for each two week period in which Obligations are outstanding under this Agreement, which Biweekly Report shall be provided by the Debtor to the Lender no later than the close of business on the second Monday following the two week period at issue, or if such Monday is not a Business Day, the next Business Day following such Monday;

(ii) such financial and other reports as are reasonably requested by the Lender to allow the Lender to confirm the Debtor's compliance with the Budget and the terms of this Agreement;

(iii) as soon as reasonably practicable after obtaining knowledge of the commencement of, or of a material threat of the commencement of, an action, suit or proceeding against the Debtor that could adversely affect the business, properties, financial position, results of operations or prospects of the Debtor or that in any manner questions the validity of this Agreement, any other document to which the Debtor and the Lender are parties or any of the other transactions contemplated hereby or thereby, the nature of such pending or threatened action, suit or proceeding and such additional information as may be reasonably requested by the Lender; and

(iv) from time to time such additional information regarding the financial position, results of operations or business of the Debtor as the Lender may reasonably request.

Section 6.2    Supplemental Budgets.  By no later than the fifth Business Day of each month after the entry of the Final Order, the Debtor shall deliver or cause to be delivered to the Lender

an updated, rolling 13-week budget of sources and uses of cash that sets forth updated projected sources and uses of cash during the period commencing from the end of the previous week through and including 13 weeks thereafter; provided, however, that such updated budget shall not be considered a Supplemental Budget unless the Lender approves such budget, in its reasonable discretion, within three (3) business days of its receipt of such budget. If the Lender does not give notice to the Debtor and its counsel of record that it does not approve such budget within three (3) business days of its receipt of such budget, such budget shall be deemed approved by the Lender.

Section 6.3    Conduct of Business and Maintenance of Existence.    The Debtor shall (a) continue to engage in business of the same general type as conducted by the Debtor on the Effective Date, (b) maintain the Collateral in a commercially reasonable manner, and (c) preserve, renew and keep in full force and effect the corporate existence of the Debtor and its rights, privileges and franchises necessary or desirable in the normal conduct of business. The Debtor shall notify the Lender of any change in its place of business, location(s) of the Collateral and location(s) of books and records at least ten (10) days prior to such change(s). In addition, the Debtor shall not change its name, identity or corporate structure in any manner or use any trade, assumed or fictitious name except after providing at least ten (10) days' notice prior to the effective date of such change.

Section 6.4    Compliance with Laws.    The Debtor shall comply with all applicable laws, ordinances, rules, regulations, and requirements of Governmental authorities except where the necessity of compliance therewith is contested in good faith by appropriate proceedings; provided, however, that the Debtor shall notify the Lender of any such proceedings within ten (10) days after the initiation of such proceedings.

Section 6.5    Accounting; Inspection of Property, Books and Records.    The Debtor shall keep proper books of record and account in which full, true and correct entries in conformity with GAAP shall be made of all dealings and transactions in relation to each of its businesses and activities, and shall maintain its fiscal reporting periods on the basis used upon execution of this Agreement. The Debtor shall at all times (but in no event later than 48 hours after request) provide representatives of the Lender with full and free access during normal business hours (i) to visit and inspect any of its properties, (ii) to reexamine all books and records of the Debtor and to make abstracts and photocopies thereof, and (iii) to discuss the Debtor's affairs, finances and accounts with its officers, employees and independent public accountants as the Lender may deem necessary or desirable in its reasonable discretion.

Section 6.6    Debt.    The Debtor shall not incur or at any time become liable with respect to any new Debt except (i) Debt outstanding under this Agreement or any other document to which the Debtor and the Lender are parties, or (ii) normal and customary trade Debt incurred in the ordinary course of the Debtor's business and necessary for the Debtor's business operations and in accordance with the Budget and the terms of this Agreement.

Section 6.7     Restriction on Liens.  The Debtor shall not at any time create, assume or suffer to exist any Lien on any property or asset now owned or hereafter acquired by them or assign or subordinate any present or future right to receive assets except:

> (i) any Liens created pursuant to this Agreement and created by any other documents to which the Debtor and the Lender are or may become parties; and

> (ii) Liens securing Taxes, assessments or Governmental charges or levies or the claims or demands of materialmen, mechanics, carriers, warehousemen, landlords and other like persons; provided (A) with respect to Liens securing state and local Taxes, such Taxes are not yet payable, (B) with respect to Liens securing claims or demands of materialmen, mechanics, carriers, warehousemen, landlords and the like, such Liens are unfiled and no other action has been taken to enforce the same, and (c) with respect to Taxes, assessments or Governmental charges or levies or claims or demands secured by such Liens, payment of which is not at the time required;

Section 6.8     Notices.  The Debtor shall advise the Lender promptly and in reasonable detail, (i) of any Lien, security interest, encumbrance or claim made or asserted against any of the Collateral, (ii) of any material change in the composition of the Collateral, and (iii) of the occurrence of any other event that would have a material effect on the aggregate value of the Collateral or on the security interests granted to the Lender in this Agreement.

Section 6.9     Consolidations, Mergers and Sale of Assets.  The Debtor shall not (i) consolidate or merge, in whole or in part, with or into any other Person, or (ii) sell, lease or otherwise transfer all or any substantial part of its assets to any other Person, except upon the express written consent of the Lender and through a Bankruptcy Court approved sale or other procedure, the order for which shall provide that the Lender's Liens shall attach to the proceeds of such sale and which order shall be satisfactory to the Lender in its reasonable discretion.

Section 6.10    Capital Expenditures.  The Debtor shall not directly make or commit to make any expenditures with respect to the purchase or other acquisition of fixed or capital assets except as is approved in writing by the Lender or is provided for in the Budget.

Section 6.11    Transactions with Other Persons.  Except as contemplated hereby, the Debtor shall not enter into any agreement with any Person whereby the Debtor shall agree to any restriction on the Debtor's right to amend or waive any of the provisions of this Agreement.

Section 6.12    Independence of Covenants.  All covenants contained herein shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that such action or condition would be permitted by an exception to, or otherwise be within the limitations of, another covenant shall not avoid or prevent the occurrence of a Event of Default if such action is taken or condition exists.

## ARTICLE VII
## Event of Default/Remedies

Section 7.1    Events of Default.  Each of the following conditions or events shall constitute an Event of Default for purposes of this Agreement:

> (i) the Debtor fails to pay when due any principal or interest on any Loan, any fee or any other amount payable hereunder, or under any document to which the Debtor and the Lender are parties or with respect to any other Obligation of the Debtor to the Lender;

> (ii) the Debtor's expenses exceed the Permitted Variance or the Debtor's revenues are less than the Permitted Variance, and the Debtor does not correct this failure within three (3) Business Days after written notice of such failure has been given to the Debtor by the Lender;

> (iii) the Debtor fails to observe or perform any covenant or agreement contained in this Agreement, other than those expressly identified in Section 7.1 of this Agreement, for three (3) Business Days after written notice of such failure has been given to the Debtor by the Lender;

> (iv)  an appeal, or motion to reconsider, amend or vary is filed with respect to the Final Order;

> (v) the Bankruptcy Court enters an order (A) appointing a trustee under chapter 11 of the Bankruptcy Code, (B) appointing an examiner with or without expanded powers, (C) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, or (D) dismissing the Bankruptcy Case;

> (vi) the Bankruptcy Court fails to enter (a) a temporary restraining order, (b) a preliminary injunction, or (c) a final order, in form and substance acceptable to the Lender in its sole discretion, within the time period specified in Section 3.2(v) of this Agreement enjoining claims related to the Debtor against the Lender or any of ffiliates, as the case may be;

> (vii) neither (a) a temporary restraining order, (b) a preliminary injunction nor (c) a final order, in form and substance acceptable to the Lender in its sole discretion, is not stayed and is in effect and valid enjoining (1) claims related to the Debtor against the Lender and its affiliates, and (2) claims related to the Debtor against the Lender;

> (viii) the termination or expiration of the exclusive period for the Debtor to file a plan of reorganization in the Bankruptcy Case;

> (ix) any representation, warranty, certification or statement made by the Debtor in this Agreement or any agreement to which the Debtor and the Lender are parties or by the Debtor in any certificate, financial statement or other document delivered pursuant hereto

18

or thereto proves to have been incorrect in any material respect when made, and the Debtor does not take actions that result in the representation, warranty, certification or statement being correct as of the date of such actions within three (3) Business Days after written notice of such failure has been given to the Debtor by the Lender;

(x) this Agreement ceases to be effective to grant a perfected security interest in the Collateral with the priority stated to be created thereby or such security interest ceases to be in full force and effect or is declared null and void, or the validity or enforceability of such security interest or this Agreement is contested by the Debtor or any other interested party, or the Debtor denies that it has any further liability or obligation under this Agreement;

(xi) the Debtor fails to perform any of its obligations under this Agreement and the applicable cure periods, if any, expire;

(xii) any creditor of the Debtor obtains possession of any of the Collateral by any means, including, without limitation, levy, distraint, replevin or self-help or any such creditor establishes or obtains any right in the Collateral that is equal to or senior to the Liens of the Lender on such Collateral and the Debtor is unable to obtain an order of the Bankruptcy Court within ten (10) days discharging such levy, distraint, replevin or self-help;

(xiii) the Debtor makes any agreement, contingent or otherwise, to merge into, sell all or any substantial portion of the Collateral to, or otherwise assign or transfer all or any substantial portion of its assets, other than in the ordinary course of business, to any Person, except as permitted in Section 6.10 of this Agreement;

(xiv) the Debtor fails to perform any of its obligations under the Lease as assumed in the Final Order – in addition, a failure by the Debtor to perform any of its obligations under this Agreement shall constitute a default under the Lease;

(xv) any act or omission by the Debtor in contravention of the provisions of the Bankruptcy Code; and

(xvi) the right, pursuant to Section 506(c) of the Bankruptcy Code, is granted to any party to charge expenses of administration of the Debtor's Bankruptcy Case against the Lender's Collateral.

Upon the occurrence of an Event of Default, and at any time thereafter during the continuance of such event, and without further order of or application to the Bankruptcy Court, the Lender may take one or more of the actions and exercise one or more of the remedies set forth below in this Article VII, provided, however, that with respect to the enforcement of Liens or other remedies with respect to the Collateral, the Lender shall provide the Debtor with three (3) Business Days' written notice prior to taking the action contemplated thereby; provided, further, that upon receipt of such notice, the Debtor may continue to make ordinary course

disbursements but may not withdraw or disburse any other amounts. Unless stayed by an order of the Bankruptcy Court entered within the three-day notice period, the Lender can proceed to enforce its remedies provided herein or otherwise without further order of or application to the Bankruptcy Court.

Section 7.2    Termination of Commitment/Acceleration. Immediately upon and following the occurrence of any Event of Default, the Lender, at its option, may (a) terminate the Commitment, and (b) declare the Obligations (together with accrued and unpaid interest and expenses and any other obligations that may be due to the Lender under this Agreement or any document to which the Debtor and the Lender are parties) to be immediately due and payable without presentment, demand, protest or notice of any kind, all of which are hereby irrevocably and absolutely waived by the Debtor.

Section 7.3    UCC Rights. Immediately upon and following the occurrence of any Event of Default, the Lender may in addition to all other rights and remedies granted to it in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Obligations, exercise all rights and remedies of a secured party under the UCC and all other rights available to the Lender at law or in equity, subject to the Carve-Out.

Section 7.4    Right of Set-Off. Immediately upon and following the occurrence of any Event of Default, the Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Lender to or for the credit or the account of the Debtor against any and all of the Obligations, regardless of whether the Lender has made any demand hereunder, subject to the Carve-Out.

Section 7.5    Payments on Collateral. Subject to the Carve-Out and without limiting the rights of the Lender under any other provision of law or this Agreement, immediately upon and following the occurrence of an Event of Default:

(i)    all payments received by the Debtor under or in connection with any of the Collateral shall be held by the Debtor in trust for the Lender, shall be segregated from other funds of the Debtor and shall forthwith upon receipt by the Debtor be turned over to the Lender, in the same form as received by the Debtor (duly indorsed by the Debtor to the Lender, if required to permit collection thereof by the Lender); and

(ii)    all such payments received by the Lender (whether from the Debtor or with respect to the Collateral) shall be applied by the Lender to the payment of Obligations and any expenses as set forth in Section 7.11 of this Agreement.

Section 7.6    Possession of Collateral. In furtherance of the foregoing, subject to the Carve-Out, the Debtor expressly agrees that, immediately upon and following the occurrence of an Event of Default, the Lender may (i) by judicial powers, or without judicial process if it can be done without breach of the peace, enter any premises where any of such Collateral is or may be located, and without charge or liability to the Lender seize and remove such Collateral from such

premises and (ii) have access to and use of the Debtor's books and records relating to such Collateral.

Section 7.7  Sale of Collateral.  Subject to the Carve-Out, immediately upon and following the occurrence of an Event of Default, the Lender, without demand of performance or other demand or notice, may forthwith collect, receive, appropriate and realize upon the Collateral and/or forthwith sell, lease, assign, give an option or options to purchase or otherwise dispose of and deliver the Collateral (or contract to do so) or any part thereof in one or more parcels at public or private sale, at any exchange, broker's board or at any office of the Lender or elsewhere in such manner as is commercially reasonable and as the Lender may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  The Lender shall have the right upon any such public sale, and, to the extent permitted by law, upon any such private sale, to purchase the whole or any part of the Collateral so sold.  The Debtor further agrees, at the Lender's request, to assemble the Collateral, and to make it available to the Lender at places which the Lender may reasonably select.  To the extent permitted by applicable law, the Debtor waives all claims, damages and demands against the Lender arising out of the foreclosure, repossession, retention or sale of the Collateral, provided such remedies of the Lender are pursued in a commercially reasonable manner.

Section 7.8  Rights of Purchasers.  Subject to the Carve-Out, upon any sale of the Collateral (whether public or private) consistent with the terms of this Agreement, the Lender shall have the right to deliver, assign and transfer to the purchaser thereof the Collateral so sold.  Each purchaser (including the Lender) at any such sale shall hold the Collateral so sold free from any claim or right of whatever kind, including any equity or right of redemption of the Debtor to the extent permitted by law.  The Debtor hereby specifically waives all rights of redemption, including, without limitation, the right to redeem the Collateral under Section 9-623 of the UCC, and any right to a judicial or other stay or approval that it has or may have under any law now existing or hereafter adopted.

Section 7.9  Remedies Not Exclusive.  No remedy conferred upon or reserved to the Lender in this Agreement is intended to be exclusive of any other remedy or remedies, but every such remedy shall be cumulative and shall be in addition to every other remedy conferred herein or now or hereafter existing at law, in equity or by statute.

Section 7.10  Power of Attorney.  Subject to the Carve-Out, upon relief from the automatic stay being granted by the Final Order or another order of the Bankruptcy Court, the Debtor irrevocably appoints the Lender, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Debtor and in the name of such Debtor or in the Lender's own name, to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of this Agreement and, without limiting the generality of the foregoing, grants the Lender the power and right, on behalf of such Debtor to do the following:

(i) to pay or discharge taxes, liens, security interests or other encumbrances levied or placed on or threatened against the Collateral;

(ii) to effect any repairs or to obtain any insurance called for by the terms of this Agreement and to pay all or any part of the premiums therefor and the costs thereof; and

(iii) immediately upon and following the occurrence of any Event of Default and otherwise to the extent provided in this Agreement, (A) to direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due and to come due thereunder directly to the Lender or as the Lender shall direct; (B) to receive payment of and receipt for any and all moneys, claims and other amounts due and to become due at any time with respect to or arising out of any Collateral; (C) to sign and indorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with accounts and other documents relating to the Collateral; (D) to assign any Patent, Trademeark, Copyright, License (along with the goodwill of the business to which such intellectual property pertains), for such term or terms, on such conditions, and in such manner, as the Lender shall in its sole discretion determine; and (E) generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Lender were the absolute owner thereof for all purposes, and to do, at the Lender's option and the Debtor's expense, at any time, or from time to time, all acts and things that the Lender deems necessary to protect, preserve or realize upon the Collateral and the Lender's security interest therein, in order to effect the intent of this Agreement, all as fully and effectively as the Debtor might do.

The Debtor hereby ratifies all that the Lender and all substituted attorneys shall lawfully do or cause to be done by virtue hereof. Each power of attorney granted in this Agreement is a power coupled with an interest and shall be irrevocable.

Section 7.11  Application of Proceeds.  Subject to the Carve-Out, the Lender may retain the net proceeds of any collection, recovery, receipt, appropriation, realization or sale of the Collateral and, after deducting all reasonable costs and expenses of every kind incurred therein or incidental to the care and safekeeping of any or all of the Collateral or in any way relating to the rights of the Lender hereunder, including reasonable attorneys' fees and legal expenses, apply such net proceeds to the payment in whole or in part of the Obligations or certain of the Obligations in such order and against such Obligations as the Lender may elect, the Debtor remaining liable for any amount remaining unpaid (and any attorneys fees paid by the Lender in collecting such deficiency) after such application.  Any such proceeds remaining after payment in full of the Obligations shall be remitted to the Debtor.  The Lender shall have no obligation whatsoever to seek satisfaction from any particular item(s) or type(s) of property or Collateral, but may, in its sole discretion, foreclose upon, realize against or otherwise enforce its rights in items of Collateral in any order or priority.

## ARTICLE VIII
### Miscellaneous

Section 8.1    Notices.  All notices, requests and other communications to a party hereunder shall be in writing and shall be given to such party at its address set forth below, or such other

address as such party may hereafter specify for the purpose by notice to the other, with a copy of such communication to counsel for such party. Each such notice, request or other communication shall be effective (i) if given by mail, three (3) days after such communication is deposited in the mails with first class postage prepaid, addressed as aforesaid or (ii) if given by any other means, when delivered at the address specified in this Section. Notices shall be sent to the following addresses:

If to the Debtor:

The Dominion Club, L.C.
Vice President of Finance and Accounting
James A. Crowder
11237 Nuckols Road
Glen Allen, Virginia 23059

With a copy to:

Vernon E. Inge, Jr. Esq.
LeClairRyan, A Professional Corporation
701 East Byrd Street, 16th Floor
Richmond, Virginia 23219
Phone: 804-343-4095
Facsimile: 804-783-7632
Electronic Mail: vernon.inge@leclairryan.com

If to the Lender:

Loch Levan Land Limited Partnership
11237 Nuckols Road
Glen Allen, Virginia 23059

With a copy to:

Robert S. Westermann, Esq.
Hirschler Fleischer, A Professional Corporation
The Edgeworth Building
2100 East Cary Street
Richmond, Virginia 23223
Phone: 804-771-5610
Facsimile: 804-644-0957
Electronic Mail: rwestermann@hf-law.com


Section 8.2    No Waivers.  No failure or delay by the Lender in exercising any right, power or privilege hereunder or under any other document to which the Debtor and the Lender are parties

shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

Section 8.3    Expenses. The Debtor shall pay to the Lender all reasonable costs and out-of-pocket expenses, including legal and other professional fees, incurred by the Lender in connection with, arising out of, or related to this Agreement and the conduct of the Bankruptcy Case, including without limitation the costs of (i) the preparation, closing and administration of this Agreement and any requests by the Debtor concerning this Agreement or its administration, including any waiver, extension or consent hereunder or any amendment hereof or any Event of Default or alleged Event of Default hereunder; (ii) enforcing or defending any of the Lender's rights hereunder, including but not limited to, any action taken to enforce anything the Debtor is obligated to do hereunder; and (iii) any Event of Default and collection and other enforcement proceedings resulting therefrom, including any action taken to preserve, protect, sell or otherwise dispose of any Collateral and any action taken to defend the Lender concerning the Collateral or on account of any action it may take to enforce any right hereunder or any right to any Collateral. The Debtor shall indemnify the Lender against any transfer taxes, documentary taxes, assessments or charges made by any governmental authority by reason of the execution and delivery of this Agreement or any other documents to which the Debtor and the Lender are parties.

Section 8.4    Amendments and Waivers. Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by the Debtor and the Lender.

Section 8.5    Successors and Assigns; Survival. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except that the Debtor may not assign or otherwise transfer any of its rights under this Agreement without the prior written consent of the Lender. The provisions of this Agreement shall survive the termination of this Agreement and shall continue in full force and effect so long as any Obligation is outstanding.

Section 8.6    Virginia Law. This Agreement and any other documents to which the Debtor and the Lender are parties shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, except as otherwise provided herein, notwithstanding any conflicts of law rules, principles or laws that would result in the application of the laws of another Commonwealth or State.

Section 8.7    Counterparts; Effectiveness. This Agreement may be signed in any number of counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same instrument. This Agreement shall become effective when (i) the Lender has received counterparts hereof signed by both parties and (ii) the Bankruptcy Court has entered the Final Order.

Section 8.8    Waiver of Jury Trial; Submission to Jurisdiction.  The Debtor hereby irrevocably and unconditionally waives all right to trial by jury in any action, proceeding, or counterclaim arising out of or related to this Agreement.  The Debtor and the Lender hereby agree that all actions, suits or other proceedings arising out of or relating in any way to this Agreement shall be brought only in (i) the court in which the Debtor's Bankruptcy Case is pending or (ii) if the Debtor's Bankruptcy Case is no longer pending, the state or federal courts located in Henrico County, Virginia.    Each of the Debtor and the Lender hereby knowingly, voluntarily, intelligently, absolutely and irrevocably waives and agrees not to assert in any such action, suit or proceeding that it is not subject to the personal jurisdiction of the courts identified in the preceding sentence or that the action, suit or proceeding should be transferred to a different venue under *forum non conveniens* principles or statutes or rules embodying such principles.

Section 8.9    Severability.    If any provision hereof is invalid and unenforceable in any jurisdiction, then, to the fullest extent permitted by law, (i) the other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in order to carry out the intentions of the parties hereto as nearly as may be possible; and (ii) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provisions in any other jurisdiction.

Section 8.10   Entire Agreement; Conflicts.  This Agreement sets forth the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all previous understandings, written or oral, in respect thereof.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

Debtor:

**THE DOMINION CLUB, L.C.**

By: _James A. Crowder, Manager_

Lender:

**LOCH LEVAN LAND LIMITED PARTNERSHIP**

By: _NHHunt/Wyndham Development Corp._
by its General Partner
by David E. Buemung
President

# EXHIBIT A

## Initial Budget

DRAFT - SUBJECT TO CHANGE
ATTORNEY/CLIENT WORK PRODUCT
PRIVILEGED AND CONFIDENTIAL

Exhibit A

**The Dominion Club, L.C.**
13-Week Cash Flow Projection

Week ending Friday

| | 1/14 | 1/21 | 1/28 | 2/4 | 2/11 | 2/18 | 2/25 | 3/4 | 3/11 | 3/18 | 3/25 | 4/1 | 4/8 | 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Total |
| **I. Receipts** | | | | | | | | | | | | | | |
| a) Operating Revenue | | | | | | | | | | | | | | |
| Membership Dues | $ 22,356 | 42,680 | 101,619 | 36,583 | 20,567 | 39,264 | 93,486 | 33,655 | 20,548 | 39,228 | 93,401 | 33,624 | 20,566 | $ 597,577 |
| Other Member Charges | 19,561 | 37,344 | 88,915 | 32,009 | 5,218 | 9,962 | 23,719 | 8,539 | 5,458 | 10,419 | 24,807 | 8,931 | 8,567 | 283,450 |
| Banquet | 5,998 | 5,998 | 5,328 | 5,328 | 5,328 | 5,328 | 9,371 | 9,371 | 9,371 | 9,371 | - | 22,143 | 22,143 | 115,079 |
| | 47,915 | 86,022 | 195,863 | 73,921 | 31,113 | 54,554 | 126,576 | 51,565 | 35,377 | 59,019 | 118,208 | 64,698 | 51,276 | 996,107 |
| b) Non-Refundable Initiation Fee | - | - | 691 | - | - | - | 1,250 | - | - | - | 11,750 | - | - | 13,691 |
| Total Receipts | 47,915 | 86,022 | 196,553 | 73,921 | 31,113 | 54,554 | 127,826 | 51,565 | 35,377 | 59,019 | 129,958 | 64,698 | 51,276 | 1,009,797 |
| **II. Disbursements** | | | | | | | | | | | | | | |
| a) Operating | | | | | | | | | | | | | | |
| Payroll | - | 68,687 | - | 63,060 | - | 61,134 | - | 61,279 | - | 64,311 | - | 63,490 | - | 381,961 |
| Taxes & Sales Incentives | - | 20,816 | - | 11,718 | - | 13,896 | - | 18,822 | - | 11,201 | - | 16,110 | - | 92,563 |
| Cost of Sales | 2,000 | 2,000 | 5,533 | 4,857 | 4,857 | 2,209 | 4,857 | 8,643 | 1,072 | 8,643 | 8,643 | 12,634 | 4,651 | 70,598 |
| Land Lease | - | - | - | 92,700 | - | - | - | 92,700 | - | - | - | - | 92,700 | 278,100 |
| HHHunt Shared Services | - | - | - | 34,063 | - | - | - | 34,063 | - | - | - | - | 34,063 | 102,189 |
| Utilities | 633 | 1,150 | - | 3,558 | 1,003 | 8,315 | - | 5,562 | 1,015 | 7,375 | - | 10,890 | 1,032 | 40,533 |
| Other Costs | 16,297 | 25,573 | 27,034 | 15,652 | 34,683 | 19,949 | 26,648 | 15,652 | 28,474 | 31,300 | 32,113 | 21,443 | 13,397 | 308,215 |
| | 18,930 | 118,226 | 32,568 | 225,607 | 40,543 | 105,503 | 31,505 | 236,720 | 30,561 | 122,830 | 40,756 | 124,568 | 145,842 | 1,274,159 |
| Cash Flow from Operations | 28,985 | (32,204) | 163,986 | (151,687) | (9,430) | (50,949) | 96,321 | (185,155) | 4,816 | (63,811) | 89,202 | (59,870) | (94,566) | (264,362) |
| b) Non-operating / Chapter 11 | | | | | | | | | | | | | | |
| Professional Fees - Debtor | - | - | - | - | - | - | 106,000 | - | - | - | 84,750 | - | - | 190,750 |
| Professional Fees - CC | - | - | - | - | - | - | 12,750 | - | - | - | 12,750 | - | - | 25,500 |
| US Trustee Fees | - | - | - | - | - | - | - | - | - | - | - | - | 6,500 | 6,500 |
| Noticing Agent | 15,000 | - | - | - | - | - | - | - | - | - | - | - | - | 15,000 |
| Utility Deposit | - | - | 9,804 | - | - | - | - | - | - | - | - | - | - | 9,804 |
| DIP Interest Payments | - | - | - | 50 | - | - | - | 210 | - | - | - | 714 | - | 973 |
| Capital Expenditures | - | - | 5,500 | - | - | - | - | - | - | - | 10,000 | - | - | 15,500 |
| | 15,000 | - | 15,304 | 50 | - | - | 118,750 | 210 | - | - | 107,500 | 714 | 6,500 | 264,027 |
| **III. Net Change in Cash before DIP** | 13,985 | (32,204) | 148,682 | (151,737) | (9,430) | (50,949) | (22,429) | (185,365) | 4,816 | (63,811) | (18,298) | (60,584) | (101,066) | (528,389) |
| **IV. Beginning Cash Balance** | 50,000 | 100,000 | 100,000 | 180,463 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 50,000 |
| Net Change in Cash | 13,985 | (32,204) | 148,682 | (151,737) | (9,430) | (50,949) | (22,429) | (185,365) | 4,816 | (63,811) | (18,298) | (60,584) | (101,066) | (528,389) |
| DIP Draw / (Paydown) | 36,015 | 32,204 | (68,219) | 71,274 | 9,430 | 50,949 | 22,429 | 185,365 | (4,816) | 63,811 | 18,298 | 60,584 | 101,066 | 578,389 |
| Ending Cash Balance | $ 100,000 | $ 100,000 | $ 180,463 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 |
| **V. DIP Loan** | | | | | | | | | | | | | | |
| Beginning Balance | - | 36,015 | 68,219 | - | 71,274 | 80,703 | 131,652 | 154,081 | 339,446 | 334,630 | 398,441 | 416,739 | 477,323 | - |
| Draw / (Paydown) | 36,015 | 32,204 | (68,219) | 71,274 | 9,430 | 50,949 | 22,429 | 185,365 | (4,816) | 63,811 | 18,298 | 60,584 | 101,066 | 578,389 |
| Ending balance | $ 36,015 | $ 68,219 | $ - | $ 71,274 | $ 80,703 | $ 131,652 | $ 154,081 | $ 339,446 | $ 334,630 | $ 398,441 | $ 416,739 | $ 477,323 | $ 578,389 | $ 578,389 |

**EXHIBIT B**

**Final Order**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

|  |  |  |  |
|---|---|---|---|
| In re: | ) | | |
| | ) | | |
| THE DOMINION CLUB, L.C., | ) | Case No. 11-30187 | |
| | ) | Chapter 11 | |
| Debtor. | ) | | |
| | ) | | |

**FINAL ORDER AUTHORIZING THE DEBTOR TO (A) OBTAIN
POST-PETITION, SECURED FINANCING AND (B) ASSUME UNEXPIRED LEASE**

Upon the Motion (the "**Motion**")[1] of the above-captioned debtor and debtor-in-possession (the "**Debtor**") for, among other things, entry of an order pursuant to sections 105, 362, 363, 364, 365 and 507 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**"), and Rules 4001, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (i) granting the Debtor authority to obtain post-petition, secured, super-priority financing (the "**DIP Financing**") from Loch Levan Land Limited Partnership (the "**Lender**"), on the terms and conditions of that certain Post-Petition Loan and Security Agreement dated January 11, 2011, a copy of which is attached hereto as Exhibit A (the "**DIP Financing Agreement**"), and (ii) authorizing the assumption of the Lease, and notice of the

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the DIP Financing Agreement.

Bruce H. Matson (Virginia Bar No. 22874)
Vernon E. Inge, Jr. (Virginia Bar No. 32699)
Christian K. Vogel (Virginia Bar No. 75537)
LeClairRyan, A Professional Corporation
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 783-2003

*Proposed Counsel for Debtor and Debtor in Possession*

Motion having been given to the Office of the United States Trustee, counsel for the Official Committee of Unsecured Creditors, the 48 largest unsecured creditors of the Debtor and any party that has filed a notice of appearance in this case; and the Court having conducted a hearing on January __, 2011, to consider the relief requested in the Motion (the "**Hearing**"); all objections having been resolved by the Debtor prior to the hearing; and upon the entire record of this case, including any evidence presented or statements of counsel at the Hearing; and after due deliberation thereon; and good and sufficient cause appearing therefor;

IT IS HEREBY FOUND AND DETERMINED THAT:

A.     The Debtor filed for chapter 11 relief on January 11, 2011 (the "**Petition Date**") and continues to manage its business and property as a debtor-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108 in this case (the "**Bankruptcy Case**").

B.     The notice given by the Debtor of the Motion constitutes due and sufficient notice of the Motion and the Hearing as may be required by the Bankruptcy Rules and the local rules of this Court, and creditors and all parties in interest have had adequate opportunity to appear and be heard on the Motion.

C.     The DIP Financing is necessary to allow the Debtor to continue to operate its business while in bankruptcy and to further its reorganization efforts.

D.     Given the Debtor's current financial condition and capital structure, the Debtor is unable to obtain sufficient unsecured credit, allowable under Bankruptcy Code § 503(b) as an administrative expense, to allow it to continue to operate its business.

E.     A secured financing facility on terms comparable or superior to those of the DIP Financing is not available to the Debtor.

F.     The DIP Financing has been negotiated by the Debtor and the Lender in good faith within the meaning of section 364(e) of the Bankruptcy Code, and any credit extended and loans made to the Debtor pursuant to the DIP Financing Agreement shall be deemed to have been extended, issued or made, as the case may be, in good faith by the Lender as required by, and within the meaning of, Bankruptcy Code § 364(e).

G.     The terms of the DIP Financing are fair and reasonable, are ordinary and appropriate for secured financing to a debtor-in-possession, reflect the Debtor's prudent exercise of business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

H.     The assumption of the Lease as required by the DIP Financing Agreement is supported by the sound business judgment of the Debtors and in the best interests of the Debtor's estate.

I.     This Court concludes that entry of this Order is in the best interests of the Debtor's estate and creditors and its implementation will, among other things, provide the Debtor with the necessary liquidity to sustain the operation of the Debtor's business while in bankruptcy and enhance the Debtor's prospects for a successful reorganization.  It is accordingly hereby

**ORDERED, ADJUDGED, AND DECREED** that:

1.     The Motion as modified by the express terms of the DIP Financing Agreement is **GRANTED** to the extent set forth herein.

2.     This Court has jurisdiction over these proceedings and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).

3.      The terms and conditions of the DIP Financing Agreement are approved.

4.      The Debtor is authorized to assume that certain lease dated August 1, 1992, as renewed and amended, between The Dominion Club, L.C. as lessee and Loch Levan Land Limited Partnership as leasor (the "**Lease**").

5.      The Debtor is further authorized to pay any cure amounts under the Lease pursuant to 11 U.S.C. § 365 and to take all action and execute all documents necessary or appropriate in connection with the assumption of the Lease without further order of the Court.

6.      The Debtor is authorized to obtain credit and borrow from the Lender, in accordance with the terms of this Order and the DIP Financing Agreement, including the Budget, a total of $1,500,000.00, or such lesser amount as is available under the terms of the DIP Financing Agreement.  The Budget may be amended by the Debtor, but only with the consent of the Lender and as provided in the DIP Financing Agreement.  Unless otherwise expressly agreed to in writing by the Lender, the proceeds of the DIP Financing shall be used exclusively for the purposes identified in the DIP Financing Agreement.

7.      The Lender's liens on the Collateral and claims, including any superpriority administrative expense claims as specified in Section 2.8 of the DIP Financing Agreement, are subject to a carve out (the "**Carve Out**") in an amount not to exceed (A) all accrued but unpaid Professional Expenses and Committee Expenses (whether then or subsequently allowed) provided in the Budget and incurred by the Debtor or Committee plus fees incurred pursuant to 28 U.S.C. § 1930 and fees payable to the clerk of the Court prior to the date of delivery by the Lender to the Debtor and its counsel of record of a notice of termination of funding (a "**Notice of Termination**") pursuant to Section 2.12 of the DIP Financing Agreement (the "**Pre-Carve Out**

**Notice Amount**"), provided that, such Pre-Carve Out Notice Amount shall not exceed the amounts set forth in the Budget for such items through the date of such notice, plus (B) $50,000 for the payment of Professional Expenses and fees incurred pursuant to 28 U.S.C. § 1930 and fees payable to the clerk of the Court arising after delivery of the Notice of Termination (the "**Post-Carve Out Notice Professional Expenses Amount**"), plus (C) the difference between the total Committee Expenses incurred as of the delivery of the Notice of Termination and $50,000 for the payment of Committee Expenses (together with the Post-Carve Out Notice Professional Expenses Amount, the "**Post-Carve Out Notice Amount**").

8. The Debtor is authorized and empowered to execute, deliver and perform, and do all acts that are required or contemplated by or in connection with this Order and the DIP Financing Agreement and any other documents to be executed and delivered in connection therewith or contemplated thereby (collectively, the "**Loan Documents**"). The Lender and the Debtor may, by mutual written agreement, amend or waive any provision of the DIP Financing Agreement.

9. All obligations under this Order and the DIP Financing Agreement that the Debtor owes to the Lender (collectively, the "**Obligations**") shall constitute obligations that are valid, binding, and enforceable against the Debtor in accordance with their terms.

10. Subject to the Carve-Out, pursuant to Bankruptcy Code § 364(c)(1), the Obligations shall constitute administrative expense claims pursuant to Bankruptcy Code §§ 503(b)(1) and 507 with priority over any and all administrative expenses of the type specified in Bankruptcy Code §§ 503(b) and 507(b) (the "**Superpriority Claims**"), subject and subordinate only to the Carve-Out, which Superpriority Claims shall be payable from and have recourse to all

prepetition and postpetition property of the Debtor and all proceeds thereof, including, without limitation, all proceeds and other amounts received in respect of the Debtor's claims, causes of action and rights arising under state or federal law in connection with Chapter 5 of the Bankruptcy Code.

11.     Other than as expressly described herein, no claim, cost or expense of administration under Bankruptcy Code §§ 105, 364(c)(1), 503(b), 506(c), 507(b) or otherwise, including those resulting from the conversion of the Bankruptcy Case to a case under chapter 7, shall be senior to, or *pari passu* with, the Superpriority Claims of the Lender while any of the Obligations remain outstanding.

12.     Subject to the Carve-Out, pursuant to Bankruptcy Code §§ 364(c)(2) and 364(c)(3), as collateral security for the timely and full payment and performance of all of the Obligations approved herein, the Lender is hereby granted effective immediately a valid and perfected security interest in and lien upon, all present and after-acquired property of the Debtor of any nature whatsoever (both real and personal), junior only to the Carve-Out as set forth in the DIP Financing Agreement, including, without limitation, all proceeds and products, all proceeds and other amounts received in respect of the Debtor's claims, causes of action and rights arising under state or federal law in connection with Chapter 5 of the Bankruptcy Code (the "**DIP Lien**").  The Lender shall not be required to file or record mortgages, deeds of trust, security agreements, pledge agreements, financing statements, notices of lien or similar instruments, or take any other action in order to validate and perfect the DIP Lien.

13.     Pursuant to Bankruptcy Code §§ 364(c)(2) and/or 364(c)(3), the DIP Lien shall have priority over any and all other security interests, liens and other claims except for the Carve-Out, all in accordance with the terms of the DIP Financing Agreement.

14.     The DIP Lien granted to the Lender pursuant to the DIP Financing Agreement and this Order shall not be (i) subject to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under § 551 of the Bankruptcy Code or otherwise, (ii) subordinated to or made *pari passu* with any other lien or security interest under § 364(d) of the Bankruptcy Code, or (iii) subject to marshalling or any similar remedy.

15.     The automatic stay provisions of Bankruptcy Code § 362 are vacated and modified without further hearing or order to permit the Lender to file mortgages, deeds of trust, security agreements, pledge agreements, financing statements, notices of lien or similar instruments to evidence the DIP Lien and to give the Debtor any notice provided for in the DIP Financing Agreement.

16.     The automatic stay provisions of Bankruptcy Code § 362 are vacated and modified to permit the Lender, in the event that an Event of Default has occurred and is continuing and has not been waived by the Lender, without further hearing or order, to exercise all of the Lender's rights and remedies under the DIP Financing Agreement and applicable law, including, without limitation, the Lender's right to terminate its commitment to lend, accelerate the outstanding Obligations under the DIP Financing Agreement, exercise any rights of setoff or recoupment, take possession of the Collateral, and sell the Collateral all in accordance with the express terms and conditions of the DIP Financing Agreement and subject to all applicable

notice and cure provisions of the DIP Financing Agreement; provided, however, that all of the Lender's remedies are subject to the rights of the beneficiaries of the Carve-Out.

17.     The DIP Financing Agreement and the provisions of this Order shall be binding upon the Lender and the Debtor and their respective successors and assigns (including any trustee hereinafter appointed for the estate of the Debtor to the extent allowed under applicable law) and shall inure to the benefit of the Debtor, the Lender, and the Lender's successors and assigns.

18.     All credit extended and Loans made to the Debtor by the Lender shall be deemed to have been extended in good faith, as that term is used in § 364(e) of the Bankruptcy Code, and the Lender shall be entitled to the full protection of § 364(e) of the Bankruptcy Code with respect to the DIP Financing Agreement and all matters related thereto. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such stay, modification or vacation shall not affect (i) the validity, priority, or enforceability of any of the Obligations incurred by the Debtor to the Lender prior to the Lender's receipt of written notice of the effective date of such stay, modification or vacation or (ii) the validity, priority, or enforceability of the Superpriority Claims or of the DIP Lien granted hereby. Notwithstanding any such stay, modification or vacation, any of the Obligations incurred by the Debtor to the Lender prior to the Lender's receipt of written notice of the effective date of such stay, modification or vacation shall be governed in all respects by the original provisions of this Order and the DIP Financing Agreement, and the Lender shall be entitled to all of the rights, remedies, privileges and benefits granted herein and pursuant to the DIP Financing Agreement with respect to all such Obligations. Additionally, and without limitation, in the event this Order is stayed, vacated,

reversed or modified on appeal, then upon such an event, an event of default under the DIP Financing Agreement shall have occurred, and the Lender's obligations thereunder and hereunder, at the Lender's sole discretion, shall cease. The Obligations shall not be discharged by the entry of an order confirming a plan of reorganization in the Bankruptcy Case and, pursuant to Bankruptcy Code § 1141(d)(4), the Debtor has irrevocably and absolutely waived such discharge.

19.     The Debtor and its banking institution are authorized to honor pre-petition checks to the Virginia Department of Alcoholic Beverage Control, Associated Distributors, National Distributing, and Loveland Distributing.

20.     Except to the extent of the Carve Out, no expenses of administration of the Debtor's Bankruptcy Case shall be charged against or recovered from the Lender's Collateral pursuant to section 506(c) of the Bankruptcy Code.

21.     The provisions of this Order and the DIP Financing Agreement shall survive entry of any order that may be entered converting or dismissing this case, and the DIP Lien and Superpriority Claims granted herein shall maintain their priority as provided herein.

22.     In the event of any inconsistency between the provisions of this Order and the provisions of the DIP Financing Agreement or any other Loan Documents, the provisions of this Order shall govern.


Dated: Richmond, Virginia
            _____, 2011

                                        _____
                                        United States Bankruptcy Judge


9

WE ASK FOR THIS:


/s/ Christian K. Vogel_____
Bruce H. Matson (Virginia Bar No. 22874)
Vernon E. Inge, Jr.  (Virginia Bar No. 32699)
Christian K. Vogel (Virginia Bar No. 75537)
LeClairRyan, A Professional Corporation
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA  23219
(804) 783-2003

*Proposed Counsel for Debtor and Debtor in Possession*



SEEN AND AGREED:

/s/_____
Robert Westermann (Virginia Bar No. ____)
Hirschler Fleischer, A Professional Corporation
The Edgeworth Building
2100 East Cary Street
Richmond, VA 23223
(804) 771-5610
        *Counsel for Loch Levan Land Limited Partnership*



/s/_____
Robert B. Van Arsdale
Assistant United States Trustee
Office of the United States Trustee
701 East Broad Street, Suite 4304
Richmond, VA  23219

## **9022-1 CERTIFICATION**

I hereby certify that the foregoing proposed Order has been served upon or endorsed by all necessary parties.

/s/ Christian K. Vogel
Counsel